Case No. 25994. Good morning. May it please the Court. My name is Alexander Taubes. I am the attorney for the petitioner appellant Vishal Dhar. This is a case about affirmative misadvice, express misrepresentation about immigration consequences, which the district court found deficient. Just let them get out. My apologies. We want to give you our full attention. Yes. Thank you. Sorry. Go ahead. Thank you. And I also neglected to mention I'm reserving three minutes for rebuttal. Yeah. This case is about expressed misrepresentation, which, as Justice Alito stated in his concurrence in Padilla, can hardly be the basis for a voluntary and intelligent decision. What was the misrepresentation you referred to? The misrepresentation was that deportation as a consequence of this case was linked in any way to Mr. Dhar's sentence. That is, that he would have a better chance of avoiding deportation if he got a probationary sentence as opposed to an incarceratory sentence. Right. And what that does to a defendant is it tells the defendant that if you want to work on your immigration consequences, if that's the thing that's most important to you, plead guilty and start working on sentencing. Pay back the restitution. Get all of, you know, take full responsibility. Beg the judge for a probationary sentence. Because that's the only way you can improve your immigration chances. So he didn't get a — he got an incarcerated sentence. He got a year in jail. True, but — So what was — I don't understand what your argument is. The argument is — The argument was that he was told that, look, if you try to pay back your — pay your fine, pay your restitution and so forth, we may be able to get you a probationary sentence. And the problem is that the harm occurs at the plea because it's at the plea where any battle could be had that could potentially help his immigration situation. Well, at the plea, he was sworn in, right? That is true. He was under oath. And by the way, your client was a wealthy, sophisticated businessman. Is that right? Yes. With a college degree. Yes. Okay. So at the sentencing, he was sworn in. He was under oath. And the judge said under federal law, non-citizens are subject to removal and that removal is presumptively mandatory. And your client said he understood this. And he was told, by my count, eight times that his — the judgment in this case would lead to removal. I don't understand. What did he claim he didn't understand? He didn't understand the meaning of words like presumptively mandatory because those are legal words. That's what his lawyer was there to explain to him. Precisely. And his lawyer misrepresented. The judge asked him whether you've got any questions, whether there's anything you don't understand. And this college-educated, wealthy man said, I understand. Well, you don't know what you don't know. You rely on the people you pay more than $100,000 to tell you what those words mean. Right. And if they tell you that what it means is that it's not for sure, because if you get a probationary sentence, you could avoid deportation. Yeah, but he didn't get a probationary sentence. He was sentenced to jail. So what was the confusion? At the plea, he had a choice. Either try to get a probationary sentence, which admittedly he didn't get, or try to avoid the conviction that would seal the fate of his immigration. The consequences of the plea were made, it seems to me, pellucid in his sentencing memorandum, his own sentencing memorandum. The sentencing memorandum contains quite a bit of hedging and never addresses the point which expressly was represented to him, which is that the sentence, first of all, that the sentence at all would affect deportation, which it does not. But second, that if you achieve what you're trying to get, the sentencing memorandum is clearly making a pitch for probation. So the memorandum says he was taking responsibility, knowing that he likely will be deported from the United States at the conclusion of the matter. And that's, that word might is very important because legally it wasn't. Knowing that he will likely be deported from the United States at the conclusion of the matter. Likely based on what? Likely based on his sentence or likely based on whether or not the immigration authorities are so overworked that they managed to potentially. I'm just going to repeat it and tell me how to read it any other way than if I am told or if you were told, sir, that if you that you're taking responsibility, knowing that you're likely you likely will be deported from the United States at the conclusion of the matter. I think I think that that is certainly clear. Well, likely indicates a probability. It doesn't indicate the certainty legally that nothing that would have happened at that sentencing would have changed the legal status of his immigration case. Likely leaves open the possibility that perhaps if the court does what he asks, it gives a probationary sentence. He will not face deportation. And the alleged misadvice that he was given happened before the hearing, right? Correct. And but after he had agreed, I guess, in principle to enter the agreement. Yes. And so what's your theory as to how the misadvice was prejudicial that if he understood it, he was given all these warnings that were pretty clear before and after. What was the misadvice that somehow trumped what was otherwise made clear before and after? The fact that there was a meeting in April after he had agreed in principle in March, but before the plea in May, which the focus of the meeting was immigration. It demonstrates how important immigration was to him. And according to our side, and there is a dispute which perhaps should be resolved by evidentiary hearing, at that critical meeting, he was told that enough worrying about the plea. The way to avoid deportation is to avoid going to jail. And that sentencing, he says. He didn't avoid going to jail. But he couldn't even have the opportunity to work on his immigration case because once he pled guilty, his fate was sealed whether he went to jail or not. So it made no difference at that point. The constitutional harm was at the plea where he lost any opportunity to any more contest being deported. All he had to say was, I don't – I choose not to plea. I'll go to trial. His lawyers had advised him wrongly about what those consequences would be. What was the wrong advice about the – what was the wrong advice you were converting to? The wrong advice was that he was not told, even if you get probation, you'll still be deported, that it makes no difference whether you get probation or prison. That was a misrepresentation, as the district court found, because the statute does not make any distinction based on probation or incarceration. And so once you think that getting probation might help you with deportation, that holds it open as the only path to avoid it. Whereas in reality, at the time of the plea, the only path to avoid deportation was to take his case to trial or negotiate a different resolution. So he was told wrongly what the only path was. Even though, under the false framework he was given, he would have ultimately been deported anyway, he was given that false framework before his decision.  So we'll hear from the government, and you will have three minutes. Mr. Huang. Good morning. Very pleased to court. I'm David Huang, representing the United States. This is a straightforward, ineffective assistance claim to resolve on the issue of Strickland prejudice. I'd like to make two points. First, whatever misadvice that trial counsel allegedly provided about the immigration consequences of Mr. Dar's guilty plea, the district court properly concluded that he suffered no prejudice because of the accurate and consistent advisements that he received multiple times at various junctures during the underlying proceedings. These included the clear advisements in his plea agreement, in his own sworn statement at the plea colloquy, his counsel's own advice before this supposed April 16th meeting, and confirmed by multiple statements in the PSR, in Mr. Dar's sentencing memo, and in the sentencing hearing itself. Mr. Dar's only complaining about his supposed ignorance after the fact, which is not corroborated by any contemporaneous evidence. Second, to the extent there was any misadvice, it was harmless. The alleged misadvice here was conditional. If you don't get prison time, you won't get deported. When you say harmless, you mean there was no prejudice? It's under no prejudice, but I think the concept is almost akin to like a harmless kind of thing because the misadvice never came to fruition in the sense that he did get prison time. So the fact that he is now facing deportation — Mr. Solano, I'm not sure that I understand that. Sure. Because that's not really part of Strickland. Strickland does not have a harmlessness element separate, apart from the lack of prejudice. I agree, Your Honor. It is another argument that the government is making in arguing that there was no prejudice. Sure. That there was no prejudice. And the district court relied on both of these sort of arguments in denying the petition, and because there was no error, the judgment should be a harmless one. So let me ask you a question. Sure. So what if we didn't have the plea—this is the beginning, but go with me. Sure. What if we didn't have the plea colloquy or the sentencing at random? Okay. And suppose that the only evidence that existed that he understood the deportation consequences of this plea was the language of the plea agreement.  Would that be enough on its own to assure us that he was not prejudiced? Yes, Your Honor. I think the language in the plea agreement, I think, is very specific. It is not like some of the cases that my colleague at the bar summarizes or has pointed out that those are very generic warnings. The plea agreement here indicates that removal here is presumptively mandatory. Where is the plea? That's at GA-7. Okay. And then, again, in that same waiver, the defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is automatic removal from the United States, and that's at GA-8. And so I think if you combine that with Mr. Dar's, the importance of immigration proceedings that Mr. Dar claims that he was considering, I think it is reasonable to conclude that he would have been laser-focused on this waiver provision in the plea agreement. That waiver existed in the drafts that the government sent to defense before April 16th. It was the same language at the plea hearing itself in May of 2024. So both before and after the supposed April 16th meeting, that language was there and did not change. And so we get to the plea hearing, and Mr. Dar is placed under oath. He is sworn to tell the truth, and there is not a peep from him about any misapprehension, any confusion, any questions for the court or for the counsel about immigration proceedings or about this waiver. In fact, he affirmatively indicates that he understands the plea agreement and even in response to the court's specific questioning about this provision, as well as the government's proffer about this particular waiver. So unlike in, say, Lee, which there was contemporaneous evidence where the defendant there would seem surprised and say, what do you mean? I don't understand. I think the Supreme Court rightfully looked at that as indication of what was truly in the petitioner's head at the time of the plea. Here, all we have is Mr. Dar's after-the-fact, self-serving, sworn statements. And as the Supreme Court said in Allison, the sworn statements at a plea hearing are supposed to be treated with solemn respect. And so Mr. Dar cannot pick and choose which sworn statements he likes better. He's kind of saying that the sworn statements at the plea, even though it's a really, really important moment in my life, oh, that was just boilerplate. Those were just generic. Somehow I didn't really pay attention or I relied on my counsel's specific advice, of which there is no contemporaneous cooperative evidence to support that. I'm going to instead say, after the fact, after I got a prison sentence, here are my sworn, here's my sworn affidavit, to sort of paint a different picture. And I think Judge Dunhill was correct in finding there was no prejudice. I think you say just on the first part of the statement that you actually challenge that. Yes, Your Honor. Although today I think maybe prudently you're focused on prejudice. And I think the challenge is premised on the notion that there's no, he has not provided any evidence that this misadvice actually occurred or that Judge Underhill wrongly credited his testimony. I think the error is real. Yeah, I think it's a legal error that Judge Underhill committed. That's what I'm trying to understand. Sure. So I think what Judge Underhill found in his opinion was that he assumed that all, that everything in Mr. Dar's statement's affidavit were true. Yes. He assumed that, he presumed that in the face of the fact that there was no sworn affidavit provided by the government, say from Polsinelli, to sort of counter that. Well, you had the email from Polsinelli. We did, and that was actually obtained by defense counsel. And so we provided that to show that there was no corroboration, certainly, from Polsinelli. Yes, it was not sworn, but that's something the court could have. Remember, the bar is submitting this. This is under Rule 11, right? Correct, Your Honor. And I think Judge Underhill also didn't, I think, properly consider Mr. Dar's own sworn statements in sort of contrast to his after-the-fact affidavit. So your position is that Judge Underhill on the departure from got it wrong? Correct, Your Honor. Instead of assuming, he certainly could have assumed for the purposes of his decision that he just assumed that there was deficiency, or he didn't even need to address that. But he did address that on the merits. But it seemed as if it was an intention with his prejudice findings, because he's saying that he's relying only on this affidavit, the post-plea, the post-conviction affidavit, to find there's a deficiency, right? But then he relies on all this contemporaneous evidence to find that there was no prejudice, and that should have been weighed at the time that he ---- Let me ask you the following, then. Sure. Now that I think somewhat more clearly understand the argument that you're making as to the first prong, is it the government's view that if he is ---- if Mr. Dar is accurately describing the advice that he received from counsel, whoever that was, about the consequences of pleading guilty, is it the government's view that that advice was right or that that advice was wrong? Do you have a view on that? I would agree that if what counsel said was that if you receive a probationary sentence, you will not be deported, I would agree that that was wrong and constitutionally infirm. No question about that. But I think there is ---- as we pointed out in our brief, there is some distinction, I think, between whether someone is deportable as a legal matter and whether someone will be deported, which is the consequence of that. And I think the Dar's arguments throughout sort of mixes and matches deportation with deportability. And so it may be the case, and we don't know for sure, that counsel was advising Mr. Dar about the chances of deportation as opposed to his deportability. And that's never made clear, and we point that out in pages 49 and 50 of our brief. Okay. If there are no further questions. Thank you. Thank you very much.  Mr. Taubes. Am I pronouncing that correctly, Mr. Taubes? Taubes. Taubes, Taubes. Thank you, Your Honor. I want to point to two pieces of evidence that came before I was ever retained that I think corroborate this false conditional framework. So this is the V.U.S. We look to contemporaneous evidence to substantiate a defendant's express preferences? Yeah. I believe that at the sentencing, there's two points, one at Government Appendix 154, where Mr. Dar says a real consequence of going to prison is probation. Of going to prison. That's consistent. Where is that? That's at page 154 of the Government Appendix. Okay. And then also in terms of prejudice, the fact that the Court says at pages 172 to 173 of the Government Appendix, the Court asks about the immigration consequences, and nobody seems to know or no clear at the sentencing also. And what that, what it demonstrates is that it was not, pages 172 to 173 demonstrate that it was not the priority of the government to ensure that Mr. Dar was to be deported. The government didn't profess any knowledge about how that was going to be decided. But Mr. Dar has been consistent that throughout, and some of the contemporaneous pre-plea e-mails are talking about immigration and not talking about how long am I going to spend in prison. They're not talking about prison conditions. It's the, you should, at page 8054 of our appendix, you should, his counsel says you should retain an immigration attorney, which is one of the things in Padilla they say you should not be telling your criminal defense clients to do. And then in April, there is this meeting where the consensus is that avoiding prison time will avoid deportation, which is what he says later at his sentencing, that if I go to prison, I will, I will be deported. So he doesn't, look, so that's from, this is the 154. So he says a real consequence of going to prison is deportation. Yes. A real consequence of prison. Not a consequence of his conviction. But that, that's evidence that. I guess, I guess, I guess. When would he know that he was not going to go to prison? Well, he believed that this, a guilty plea in a sentencing hearing was his best chance. He ultimately didn't, he ultimately didn't get what he wanted, but it was his best chance. When in reality, true advice would have told you, your only chance is to fix this  Once you plea, nothing's going to change your immigration. So he's prejudiced at that moment of the pleaing where he doesn't know that he's giving up any chance to contest deportation. He is told, by my count, eight different times that it is a strong likelihood of being deported, presumptively mandatory, over and over and over again. What is it he didn't, I don't, you've got to help me. What is it that you think he was misled about? It was that at the time of his plea, he did not realize that nothing that happened after he pled guilty would ever change the immigration consequences. Nothing after pleading guilty could change the immigration consequences for him, that the fate was sealed at that moment. That's what he knew all along. But it's not because when a defendant is facing the decision of whether to plea, they're facing this decision of whether to keep holding out and keep fighting the case or to give up and hope for the best at sentencing. And he didn't know what he was giving up by pleading guilty, because he didn't know that his fate was sealed. And that's what the whole plea agreement told him, page after page. And that's what the plea of colloquy before the judge told him, question and answer after question and answer. The plea agreement also told him that he can rely on his attorneys, which is why right, that he could rely on his attorneys, because right after the presumptively mandatory language, Government Appendix 8, it states that claims of ineffective assistance of counsel are not being waived. Which tells someone, well, if I'm not waiving any claims about what my counsel told me, then I can trust what my counsel told me. So you're saying he went into the plea colloquy and testified under oath, but in his back pocket was the possibility of a 2255? Not knowingly. Is that what you're saying? Not knowingly, but because he was affirmatively misled at that time. You haven't established that. I agree. You really should stop saying that. I agree. Well, it's what the district court found, was that he was misled and that he was given that advice. It's not just me saying that. But additionally, I would agree with Brother Counsel on this point, that perhaps the better course for the district court was to hold an evidentiary hearing, where the court could hear from defense counsel as well as Mr. Garner. How would that fit with the Homelessness Analysis? It would because it would allow the court to assess the credibility of Mr. Darr as to whether he would have held out and insisted on a trial instead of pleading guilty if he had known the true law at the time that he pled guilty. Well, thank you very much. Thank you, Your Honors. I gave you a hard time, but that's our draw. It's greatly appreciated. Thank you, Your Honors. David. Good job. Thank you.